NOTICE
Decision filed 01/29/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220494-U

NO. 5-22-0494

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 18-CF-1570 |
| | ) | |
| FLAZE PEOPLES, | ) | Honorable |
| | ) | Ronald R. Slemer, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justice Welch concurred in the judgment.
Justice Cates concurred in part and dissented in part.

**ORDER**

¶ 1  *Held*:  Because the court conflated the *Krankel* hearing and motion to withdraw hearing into one proceeding, only defendant's ineffective assistance of claims was considered and the remaining claims made in his motion to withdraw were overlooked. We therefore remand for counsel to comply with Rule 604(d) and make any necessary amendments to the motion to withdraw the guilty plea, and the court to hold a hearing on the claims presented in the motion to withdraw guilty plea.

¶ 2  Defendant, Flaze Peoples, appeals the judgment and sentence entered on his guilty plea to home invasion. For the following reasons, we remand for a new motion to withdraw guilty plea hearing.

1

¶ 3                                    I. BACKGROUND

¶ 4      On May 30, 2018, defendant was charged, by information, with one count of home invasion (720 ILCS 5/19-6(a)(2) (West 2018)), two counts of aggravated domestic battery (*id.* § 12-3.3(a)), and one count of aggravated battery (*id.* § 12-3.05(d)(2)). A grand jury subsequently indicted defendant on the same charges.

¶ 5      The court appointed the public defender's office to represent defendant at the beginning of the case. It is unclear when public defender Tyler Bateman was assigned to defendant's case. However, the record shows Bateman represented defendant since—at least—July 25, 2018.

¶ 6      On September 13, 2018, Bateman filed a motion to withdraw as counsel per defendant's request. The court addressed Bateman's motion to withdraw at a hearing on October 1, 2018. At that time, Bateman confirmed that defendant wanted him to withdraw. Defendant informed the court that he planned on hiring an attorney to represent him but wanted to represent himself until further notice. The court questioned defendant about his highest level of education and informed defendant of the consequences and pitfalls of not having an attorney. Defendant stated that he understood. The court admonished defendant of the charges against him and penalties he faced. Defendant again stated that he understood. The court then allowed Bateman to withdraw.

¶ 7      On November 13, 2018, the court entered an order, stating that it appointed public defender Bateman to represent defendant. On December 4, 2018, Bateman filed another motion to withdraw as counsel per the defendant's request.

¶ 8      At a hearing on December 10, 2018, Bateman confirmed that defendant wanted him to withdraw from the case. The court asked defendant's intention in the case and whether he was going to hire private counsel. Defendant stated that he was going to represent himself. The court questioned defendant regarding his education and legal experience and admonished defendant of

the charges against him and penalties he faced. The court asked defendant if he would be prepared to go to prison for at least six years if he was unsuccessful at trial. Defendant stated, "No, Your Honor." The court again clarified the penalties defendant faced and asked defendant if he believed he could try the case. Defendant stated that he was going to try. The court denied the motion to withdraw and retained Bateman as defendant's counsel.

¶ 9 At a hearing on December 17, 2018, the court again addressed the possible penalties associated with defendant's charges. After the State advised the court that defendant's charges included mandatory Class X sentencing on count II and count III, the court explained that the sentencing range for each offense was 6 to 30 years' imprisonment and therefore, the only mercy the court could give was 6 years' imprisonment if the case reached the sentencing phase. It then stated,

"Again, based on your record here and the evidence most likely we are going to hear at trial, it's unlikely you are going to get the minimum from me, just so you know; all right? Probably any judge you are not going to get the minimum if you go to trial and you are found guilty by a jury on all these counts. So[,] you are going to be looking closer to the 30 than the 6; all right?"

¶ 10 Defendant stated that he understood. The court asked if defendant had any questions. Defendant replied, "Honestly[,] I just wanna get this over with. I just wanna plea bargain." The court indicated its understanding that negotiations were ongoing.

¶ 11 On January 18, 2019, defendant filed correspondence with the court requesting it "go above and beyond" and review his background. He stated he was not a bad guy but a product of his environment. Defendant wrote that he "grew up poor, uneducated, battered, bullied, molested, and unhealthy." He averred that he had been in special needs classes his entire life and was diagnosed

3

with "ADD, ADHD, severe anxiety, depression and bi-polar disorders." He stated that he took responsibility, but DCFS took his son away from his son's mother and his doctor "cut off" his medications for his mental disorders. He said he lost his mind and did not know what was going on. Defendant asserted that his public defender, Bateman, denied him a screening for his mental illnesses and was working against him. Defendant alleged that the prosecutor, Kerri Davis, used to work for his attorney, Bateman, at the public defender's office. After defendant fired Bateman, Davis told Bateman that she did not like defendant. When defendant was *pro se*, he asked her why, and she said, "It's not that I don't like you, I just don't like your background." Defendant asked whether that would be a conflict of interest. Defendant further stated that he did not want to take the offer of 20 years' imprisonment, being that it was his first violent offense, and he was not on his medications. Defendant again acknowledged that the charges were serious but said he did not know what was going on at the time. He asserted an openness for an alternative sentence including participation in any program and/or payment of fines.

¶ 12    The court held a hearing on January 22, 2019. At that time, Bateman advised the court of a negotiated plea. Bateman indicated that the State would dismiss the two aggravated domestic battery counts and the one count of aggravated battery. The State would also amend the home invasion count to remove the element of great bodily harm. In exchange, defendant would plead guilty to the amended home invasion count. The parties also agreed that for defendant's plea of guilty, his sentence should be 20 years' imprisonment that would be served at 50%. Defendant confirmed Bateman's representation of the plea agreement was correct.

¶ 13    After the court read the amended charge of home invasion, defendant stated he understood the charge. The court asked defendant how he wished to plead, and defendant replied, "I have no choice, right? Plead guilty right?" The court explained that defendant had a right to go to trial and

4

again asked if defendant wanted to plead guilty. Defendant said, "I plead guilty." Before the court accepted the plea, it admonished defendant of his rights. Defendant stated he understood those rights.

¶ 14    When the court asked if defendant had any questions about his rights, defendant asked if the court would give defendant someone other than Bateman to represent him. The court answered, "No, sir. You can have the Public Defender." Defendant stated Bateman was not in his best interest and the court needed to give defendant someone else. The court said, "No, sir."

¶ 15    Bateman spoke to defendant and reminded him that they previously discussed his desire for a different attorney and that defendant was told that if he was going to have a public defender, it would be Bateman. Defendant stated that Bateman was not representing him well enough, and he wondered if he would be assigned a different lawyer if he fired Bateman. The court replied, "Not in this county." Defendant asked how long the court would allow for him to hire private counsel. The court stated that it would provide defendant 21 days to hire a lawyer. The State said that it wanted to inform defendant that all offers would be revoked by the end of the day whether defendant hired another attorney or not; so, defendant could tell whoever he hired that the State was going to trial and would not make another offer in this case. The court asked if the State would still amend the indictment to remove great bodily harm and the State said that it would not. The court stated it was defendant's decision on whether he wanted to hire a private attorney. Defendant said, "I just plead guilty." The court asked if defendant was satisfied with Bateman's representation. Defendant replied that he was not and "plead guilty to get it over with."

¶ 16    The court then admonished defendant of the possible sentencing range and the application of the three-year mandatory supervised release. It also advised that probation was not available for the offense and defendant could be fined up to $25,000.

5

¶ 17    Defendant stated, "I was going to ask you, if I have mental conditions and I went to trial, would you be lenient towards me having mental illnesses?" The court said that if defendant was mentally ill, it would have defendant examined and the case would not go to trial if a doctor told the court that defendant was mentally ill. Defendant averred that he had been asking for a mental evaluation, and he never got one. Bateman stated that there had never been a doubt in his mind that defendant was competent. Bateman further explained that defendant informed him of his mental issues and Bateman told defendant that the mental issues were not a defense in this case and therefore the only time they would come into play would be in a sentencing decision through an open plea. Bateman again stated defendant was clearly competent.

¶ 18    Defendant interjected, stating that he was mentally ill, and it took a lot for him to sit there and behave. He further said that he had been behaving well because he did not want to get into any more trouble and "[i]t's only going to get worse." Bateman again stated he believed defendant was clearly competent.

¶ 19    The court stated that normally, people who were mentally ill did not tell the court that they were mentally ill and usually said the opposite. The State averred that it had a duty as an officer of the court to report if it—at any time—believed defendant had any kind of impairment affecting his decision-making, and it did not. The court stated there was neither evidence that defendant was mentally ill nor any evidence that would require an examination. It again asked if defendant wanted to plead guilty. Defendant stated, "Yes, I do. *** I'm just trying to get everything lined up, understand, with the best possibility for me."

¶ 20    The State then provided the following factual basis. On May 25, 2018, Sharnice Hicks lived at 3204 Belle Street, Lot A, Alton, Illinois, and there was an active order of protection prohibiting defendant from being at that location or contacting Hicks. Also, on that date, defendant

entered into Hicks's home, an argument ensued, and defendant struck Hicks repeatedly about the body and face.

¶ 21 The court asked defendant if anyone forced or threatened him to plead guilty to the amended indictment. The report of proceedings revealed that an off-the-record discussion was held at that time and no response to the question was provided on the record. When the proceedings resumed on the record, the court again asked if anyone forced or threatened defendant with anything in order for him to plead guilty to the amended indictment. Defendant replied, "No, Your Honor." Defendant provided the same response when asked if anyone promised him anything other than what was included in the negotiations. Defendant confirmed he was entering the guilty plea freely and voluntarily. Defendant also confirmed that he discussed the plea agreement with Bateman.

¶ 22 The court averred that it would bind itself to the plea agreement and sentence defendant to 20 years' imprisonment with a 3-year mandatory supervised release, and that his sentence would be subject to day-for-day credit. It further stated that counts II, III, and IV would be dismissed as well as the misdemeanor charges in cases 18-CM-5000187 and 18-CM-500272. The court asked whether defendant still wished to plead guilty. Defendant stated, "Yes, Your Honor." The court then accepted the plea.

¶ 23 The State waived the presentence investigation report. The court noted defendant's prior criminal history was in the record. It then sentenced defendant to 20 years' imprisonment with 3 years' mandatory supervised release for home invasion and ordered all other charges to be dismissed. The court asked defendant if he understood the sentence imposed. Defendant confirmed that he understood, had no questions, and that was the sentence he negotiated.

7

¶ 24    On February 12, 2019, defendant filed a *pro se* motion to withdraw his guilty plea. In the motion, he requested to withdraw his plea in exchange for his right to a fair trial. He stated he did not know how to properly draft a motion to withdraw and could not access the law library despite multiple requests. He therefore asked the circuit clerk to file a motion to withdraw for him.

¶ 25    On February 14, 2019, Bateman filed a motion to withdraw guilty plea. The motion asserted that defendant was improperly admonished by the court as to the consequences of his plea, defendant did not understand the consequences of his plea, and it was in the interest of justice that defendant be allowed to withdraw his plea.

¶ 26    On February 25, 2019, defendant filed a *pro se* motion to withdraw his plea, a letter, and an affidavit. The letter stated that defendant was withdrawing his plea to exercise his rights to a fair trial. The *pro se* motion directed that his argument to withdraw his plea could be found in his affidavit.

¶ 27    Defendant's affidavit stated the plea was the result of coercion by the public defender Bateman. Defendant explained that he felt Bateman forced him to take the 20 years based on Bateman's statements to defendant that he would get 30 years' imprisonment at 85% from the judge. Bateman also would say threatening things like "I know the judge, he's going to make you into a poster child" and "You'll get 25-30 years at 85%. It's your life not mine." Defendant also stated the court forced him to take the plea because when defendant raised Bateman's coercion, the court felt that defendant was wasting its time or being stubborn. Defendant averred that he told the court he was not pleased with Bateman's representation when asked. Also, when the court asked if defendant was forced to take the plea, defendant said, "yes, I was forced by my public defender because Mr. Bateman said you would give me 30 years at 85%" if he did not take the plea deal. Defendant asserted that the court was aggravated and replied, "Yes you are going to get

8

30 years!" Defendant alleged that when the bailiff was escorting him back to jail, defendant apologized to the court. The court then asked if defendant wanted to take the plea and defendant said yes because of the court's comment that he would get 30 years' imprisonment. Defendant stated the court instructed the woman typing, "That was off the record and now we're back on the record." The court then asked defendant the same questions to which he previously answered no, and this time, defendant answered yes.

¶ 28    In the affidavit, defendant also alleged that Bateman was ineffective because he was working for the State and would not listen to defendant. Defendant stated that he asked Bateman to remove himself from the case so defendant could receive a different public defender, but the State convinced defendant to obtain Bateman again by saying it would demand a speedy trial if defendant remained *pro se*. Defendant stated Bateman was angry when he was reappointed to defendant's case and continued not to listen to defendant. Bateman refused to present legal documents proving defendant's mental illnesses. Defendant again stated he was in special education classes throughout his life and asserted he received a Social Security check for his disabilities. Defendant asserted Bateman also denied defendant's mental evaluation requests more than three times and failed to obtain medical records showing the doctor "cut off" his medications.

¶ 29    Defendant's third listed ground in the affidavit stated that there was no factual basis for the plea. He said he did not commit home invasion because he used a key to the home in which he resided.

¶ 30    Defendant's fourth ground to withdraw asserted that he was not mentally competent to enter the plea. He stated that he suffered from ADHD, ADD, severe anxiety, and depression. He also asserted that DCFS took two of his children and he was not taking his medications prior to

9

the plea. Defendant claimed he was not in his right mind before May 25, 2018, or at any point before the plea was entered and had been off his medications for nine months.

¶ 31 On March 27, 2019, based on the ineffective assistance of counsel allegations, the court entered an order allowing Bateman to withdraw and appointed public defender Steve Griffin. On August 24, 2020, defendant filed a document entitled "Motion [for] Permission to File a Late Notice to Withdraw My 2019 Guilty Plea." In the document, defendant stated his sixth amendment right to counsel had been violated. He asserted that Griffin had not contacted him. Defendant also asserted that Bateman and the State forced him to take the guilty plea. He further contended Bateman was ineffective for failing to ask the court to impose a 10-year sentence. After Judge Tognarelli retired in December 2020, Judge Ronald R. Slemer presided over the case.

¶ 32 On September 17, 2021, the court entered an order continuing the matter and ordering defendant to file any amended pleading within 35 days. No amended pleadings were filed.

¶ 33 The motion to withdraw hearing was held March 21, 2022. Defendant testified first, stating Hicks was his children's mother. He said that their relationship was going well until his medications were cut off. Thereafter, everything went downhill. Defendant testified that prior to the incident he was taking medication for mental illnesses that included ADHD, ADD, and bipolar disorder. He was seeing Dr. Vallala at OSF Healthcare, St. Anthony's Hospital. Dr. Vallala prescribed him Adderall and Xanax for his mental illnesses, and Vicodin for his back pain. Defendant explained that he had back and ankle problems from being heavy his entire life, playing sports, and injuring himself. Defendant testified that he had been receiving Social Security Disability benefits for his physical and mental conditions since 2016. At some point, Dr. Vallala told defendant he could not treat both his back and mental illness, and defendant needed to choose

10

which was more of an issue. When defendant told him they were both issues, Dr. Vallala cut defendant off from his medications.

¶ 34　Defendant stated that on the date of the incident he was upset with Hicks because DCFS took his son away after she did not take her medication for her bipolar and schizophrenia mental illnesses and left her son in the house unattended. Defendant stated that an argument started, and his lack of medication played a big role in that.

¶ 35　Defendant testified that he initially asked Bateman to remove himself from the case because he was ineffective. Defendant explained that he asked Bateman for a mental health evaluation because defendant knew something was wrong and he needed help. Defendant asserted that Bateman was playing devil's advocate because prosecutor Davis used to be his assistant at the public defender's office, and Bateman did not know if he wanted to work for defendant or prosecutor Davis. Defendant testified that Bateman never brought discovery for defendant to review. After he went *pro se*, he obtained the discovery himself. Defendant admitted he did something wrong but stated that he needed someone to fight for him so he could get the help he needed.

¶ 36　Counsel Griffin asked if, at the time, he intended to go to trial. Defendant replied that he was going to go to trial because he was charged with something he did not do. He explained that he was not supposed to be convicted of home invasion because he did not force entry into the home and was only supposed to be convicted of a violation of order of protection and aggravated domestic battery. Defendant stated that he had a key to the residence, had personal belongings there, and stayed at the residence on a regular basis. He further stated that he provided that information to Bateman.

¶ 37     Defendant testified that he requested Bateman introduce documents showing his mental illnesses and that he had been taken off his medications and to argue that this was the only reason that this crime occurred. Defendant also testified that Bateman told him the court would impose the maximum sentence if he went to trial, and defendant brought that up on the day of his plea. Defendant further told the court that he needed a mental evaluation, but the court denied his request. He stated that Bateman also denied defendant's request for a mental evaluation three times and told the court that he felt defendant was competent. Defendant testified that he also requested Bateman file for a change of judge. Counsel Griffin asked whether Bateman explained to defendant that he got "one free change of judge," and defendant stated, "No, sir." Defendant testified that Bateman was appointed as his counsel on a 2013 burglary charge, and he ended up receiving time served for that offense. At that time, prosecutor Davis was Bateman's assistant at the public defender's office, and he met with her in that case.

¶ 38     Defendant testified that he finished high school three years later and had an Individualized Education Plan. He stated he told Bateman, and the court after defendant fired Bateman, that he wanted to go to trial for this case. He said that he was a sitting duck in jail for eight months with nothing being achieved. Defendant testified that he still communicated with Hicks, and no one at the public defender's office tried to take Hicks's statement.

¶ 39     Defendant testified that as soon as he took this deal, he did not like it. He agreed that it was fair to say his chief complaint was that neither Bateman, nor the system, took into account his mental health history and his mental state on the day of the offense. Defendant further stated that he did not commit the crime to which he pled guilty, and he was forced and threatened to plead guilty.

¶ 40     On cross-examination, defendant agreed he had a criminal history that included felony theft and felony burglary convictions in 2010. Defendant further agreed that Bateman represented him in those cases and worked hard for him at that time. Defendant stated he also had another felony theft conviction in 2011. Defendant then stated Bateman did not represent him until 2013 when he was convicted of a felony burglary. Defendant agreed at that time he was just released from his two-year prison sentence for theft and the court sentenced him to time served in that case. Defendant agreed that Bateman also represented him in 2015 for retail theft, to which defendant was sentenced to 300 days' periodic imprisonment. After counsel Griffin told defendant not to speculate, defendant stated that Bateman did not represent him in 2015.

¶ 41     The State asked defendant if he struck Hicks at her residence. Defendant stated he struck Hicks, but he was not in his right state of mind and was remorseful. Defendant agreed he struck Hicks multiple times about the body and face, causing cuts, but again apologized and stated he did not have the right state of mind. He testified he did not commit home invasion. Defendant understood home invasion required forced entry. The State asked if defendant would agree he would be guilty of home invasion if it had nothing to do with forced entry. Defendant said, "No, sir. I'm not sayin' that." Defendant agreed that he entered Hicks's apartment and struck her multiple times. Defendant said he understood the range of punishment for home invasion was 10 to 30 years' imprisonment to be served at 85% and that the State reduced that to be served at 50%. Defendant did not recall the State saying it would never offer defendant a better deal than 20 years' imprisonment to be served at 50%. Defendant agreed that Bateman discussed his mental health concerns at the plea hearing and stated the concerns did not rise to a level of being incompetent. Defendant also agreed he did not have a doctor to testify as to his mental state at the time of the plea.

¶ 42    Defendant stated that Bateman worked hard for defendant in 2013, wanted defendant to do well, and wanted him to be a productive member of society. Defendant said that he believed counsel Bateman and prosecutor Davis were working together because she was Bateman's previous assistant, and she told defendant that she did not like him and his background. Prosecutor Davis also told defendant that she would not do anything for defendant unless Bateman represented him again. The State asked if defendant wanted to get out of prison, and he replied that he wanted justice to be served. He then said that he wanted to get out of prison. When the State asked if he would do anything to get out of prison, defendant said, "Yes, sir, I would. And I would do anything to stay out of prison as well, too. I learned my lesson, sir."

¶ 43    On redirect, defendant testified that he discussed his mental state on the date of the offense to Bateman and asked him to make a proffer for the defense of temporary insanity. Defendant said that he did not believe his mental state had improved from the date of the offense until he went to jail.

¶ 44    Prosecutor Davis testified next, stating that she recalled defendant wishing to discharge Bateman because he wanted another public defender to represent him. She believed she spoke to defendant only once when he was *pro se*. Davis testified that prior to defendant discharging Bateman, she offered defendant 20 years' imprisonment and amendment to the home invasion charge to remove the great bodily harm so that day-for-day credit would apply in exchange for defendant's guilty plea. She did not remember if that was her first offer or if there were any further negotiations. To her memory, the offer had been conveyed to defendant and when he was *pro se*, he tried to negotiate a lesser offer. Then, as she did with any *pro se* defendant, she explained the offer would not go down and if they proceeded to trial and an offer was requested, the offer would

14

go up. She also told defendant that was the final offer in that case. Davis did not remember if her first offer was 15 years to be served at 85%.

¶ 45    Davis denied telling defendant that she did not like him and his background. When asked if Davis told defendant that he did not belong with his children, Davis stated that she told defendant that—based on his criminal history—she was concerned about him in society and his danger to the community. She recalled receiving a letter from defendant while he was in jail. The letter was nice and not threatening or upsetting. Davis could not recall whether there was any discussion of the defense of temporary insanity or defendant's mental state on the day of the offense. She had no knowledge of defendant's mental health history or whether defendant had been taken off of his medications shortly before the offense. She also had no knowledge on whether he had received Social Security Disability benefits in the time leading up to the offense.

¶ 46    Counsel Griffin asked if Bateman supervised Davis when she worked at the public defender's office. Davis testified that Bateman was head of the trial team, which was a title in figure only, and he was not her supervisor. She had no recollection of whether she worked with Bateman on cases while at the public defender's office. She did not recall defendant's 2013 burglary conviction or meeting with defendant on that case. Davis stated that it would be exceptionally abnormal for her to discuss or help Bateman with a burglary case.

¶ 47    On cross-examination, Davis explained that it would be abnormal to help Bateman on a burglary case because he had been working in the public defender's office for 30 years when she started, and she did not believe he ever asked her to help on any of his cases. If he had, that would be an extraordinary event that she would remember. She stated he certainly never asked her to visit a client in jail for him. The State asked if Davis's comments about defendant's danger to society were a reflection of defendant's criminal history and behavior in this case. Davis answered

15

affirmatively, stating her recollection of his criminal history was that he had violent prior offenses. Davis stated that she had no personal animosity or prejudice against defendant.

¶ 48    On redirect examination, Davis stated she had no recollection of the circumstances of how Bateman was reappointed in this case. She remembered having a conversation with defendant about Bateman being reappointed but did not remember exactly how he became reappointed. She did not recall writing an order reappointing Bateman.

¶ 49    On recross-examination, Davis testified that she would never ask for a specific attorney to be appointed on a case. She stated that it did not matter who was on the other side and she would have acted in a professional manner regardless. She further stated that she would have made the same offer to any defense attorney, and she specifically communicated that to defendant. The State questioned if she asked for Bateman to be appointed to a case, and Davis answered, "No. If I would have asked it would have been because he was the public defender and it would have been in the context of the Public Defender's Office." On redirect examination, Davis testified that she did not recall telling defendant that she was not going to speak with him unless Bateman was reappointed in the case.

¶ 50    The State called Bateman to testify. Bateman stated that he represented defendant on several occasions but could not remember exactly how many times. Bateman did not remember the 2018-19 case charging defendant with home invasion, aggravated domestic battery, and aggravated battery, but said he represented defendant on those types of cases. Bateman knew he represented defendant on a variety of cases prior to that.

¶ 51    Bateman testified that he always advised his clients of the potential penalties they face and usually on more than one occasion. When asked whether he ever forced anyone to plead guilty to a charge, Bateman stated that he had strongly advised clients on more than one occasion to plead

16

guilty and sometimes clients view that as being forced, although it was their independent decision. Bateman explained that he gave this strong advice when someone was looking at 10 years' imprisonment and he knew they would be convicted. Under such circumstances, he would explain what the evidence was, what the jury would do with that evidence, and what the result would be. Bateman testified that he never threatened any of his clients. He also never gave his clients an ultimatum. Bateman said he tried to represent his clients to the best of his ability. Bateman could not recall a specific conversation in which he advised defendant of the possible outcomes. However, he knew he had more than one conversation with defendant about what would happen at trial, the potential penalties if he went to trial, and what the judge would probably do.

¶ 52    Bateman remembered defendant discussing his mental health, several times. Bateman stated probably about 25% or more of his clients had some type of mental issue and he had some clients who were deemed incompetent. When asked if Bateman ever doubted defendant's competence, Bateman stated, "In my representation on the particular case that we're talking about, never in my mind did I think that he was incompetent as our courts determine incompetence to be, which is a very low standard." Bateman further said he never had a good faith belief to request defendant be examined on the issue of competency.

¶ 53    Bateman testified that he dealt with Davis both when she was with the public defender's office and as a prosecutor. Bateman had no memory of asking Davis to meet with defendant. Bateman testified that while he engaged in plea discussions with Davis, he did not collude against defendant. He stated that he never did anything unethical and always tried to represent defendant as any other individual and to the best of his ability, which included being clear and direct as to what Bateman believed would happen.

¶ 54 On cross-examination, Bateman stated that he fully believed he visited defendant face-to-face and went over discovery with him. He further stated, "What if any, DVDs I showed him I have no recollection. My guess is, that if he gave a statement that I would have at least had him watch that DVD." Bateman could not remember if his investigator interviewed Hicks but thought he had the investigator interview someone.

¶ 55 Bateman again testified that defendant informed Bateman of his mental issues, but Bateman could not remember the specifics of those conversations. Bateman also could not remember if defendant informed him that he had been taken off of his medication a short time before the offense. Bateman stated that because defendant informed him of his mental health history, Bateman would have followed up on that history for the purposes of sentencing. Counsel Griffin asked if Bateman could have developed a temporary insanity defense, Bateman stated that he could not have.

¶ 56 Bateman agreed Davis worked in the public defender's offices for a number of years and that he socialized with Davis outside of the office. He also agreed that after she left, he never tried a case before a jury when she was on the other side. Bateman could not remember if defendant indicated that he was uncomfortable with Bateman and Davis's relationship while Bateman represented defendant. Bateman did not agree that the optics looked bad. When asked if defendant could feel intimidated by being before a judge with an attorney who used to work and socialize with the prosecutor, Bateman stated that a defendant could feel intimidated any time he was brought into a courtroom. He also stated that clients facing 10 years in prison were in an intimidating situation. However, Bateman did not see how Davis working in Bateman's office prior to her being a prosecutor would increase defendant's fear.

¶ 57    Bateman stated defendant may have informed him that he had a key to Hicks's apartment. Bateman clarified that he could not remember exactly what defendant said, but it was defendant's position that the apartment was his residence. Bateman testified that the information did not necessarily raise an issue regarding the home invasion charge because there was an order of protection in place. Bateman agreed that in 2018, it was apparent to most of the defense that Judge Tognarelli could be particularly onerous on domestic violence offenders. Bateman further agreed that he was probably the instigator in his office to consider changing judges from Judge Tognarelli because of his approach to domestic violence cases. He stated that it was his understanding that a defendant received "one free" judge change if requested in the appropriate period of time. When asked whether he requested a change of judge in this case, Bateman said, "The record speaks for itself." Bateman also said a mental health evaluation would not have necessarily occurred even if he had proffered a defense of temporary insanity.

¶ 58    The parties were granted 30 days to submit written arguments. The State filed its argument on April 7, 2022. It contended that the record refuted the allegations that defendant did not get the deal that he negotiated and that he was mentally incompetent to plead guilty. It relied on Bateman's testimony that he addressed at length that defendant had mental issues but none of them rose to the level of incompetence to stand trial or plead guilty. It also relied on Bateman's testimony that he informed defendant of all his options, what he believed was the best option for defendant, and that he never coerced a client to take a deal but strongly hinted to some clients what the best course of action would be. The State also asserted that Davis and Bateman testified that they did not collude on this, or any other, matter. The State argued that as such, the record refuted defendant's allegations.

19

¶ 59　　Counsel Griffin filed defendant's argument in support of his motion to withdraw his guilty plea on April 25, 2022. It stated that defendant testified that he had a plausible defense to some or all of the charges, some of which may have involved lesser included offenses. It further stated that defendant also credibly testified that Davis formerly played a role in his 2013 case, while she was employed at the public defender's office, and he was not given ample opportunity to review discovery. The motion further stated, "Defendant's mental health issues, while not necessarily affording Defendant a defense nor rising to the level of 'fitness to stand trial', would have been more adequately presented through a Rule 402(d) conference, prior to trial and/or negotiated plea." The same day, Griffin filed a Rule 604(d) certificate, stating that he (1) consulted with defendant to ascertain defendant's contention of error in the entry of the guilty plea and sentence, (2) examined the court file and report of proceedings of guilty plea and sentencing hearing, and (3) made any amendments to the motion necessary for adequate presentation of any defects in those proceedings.

¶ 60　　The court filed an order on July 8, 2022, denying defendant's motion to withdraw his guilty plea. It explained that the court reviewed the record and defendant tried to manipulate the case to get a better deal. It also found the record showed defendant contradicted himself in his claims to withdraw his plea. The court determined defendant's testimony was not believable, defendant was clearly competent to enter a guilty plea, and the record showed that the plea was knowingly and voluntarily entered.

¶ 61　　　　　　　　　　　　　　　II. ANALYSIS

¶ 62　　On appeal, defendant asserts four arguments. He contends that his plea was involuntary because (1) the court refused to allow him to proceed *pro se* and (2) the court told defendant he would get the maximum sentence if he did not plead guilty. He also argues that (3) a remand is

required for a new *Krankel* hearing where the court failed to inquire into defendant's claims of ineffective counsel and (4) remand is required for Rule 604(d) compliance where Griffin failed to indicate which motion to withdraw guilty plea he proceeded on and failed to make the necessary amendments to adequately present defendant's claims. We address the last two issues on appeal; however, because we resolve this appeal on the last asserted issue, we will not address defendant's first two contentions of error.

¶ 63    The Illinois Supreme Court's decision in *People v. Krankel*, 102 Ill. 2d 181 (1984), developed a common-law procedure to address *pro se* posttrial claims of ineffective assistance of counsel. *In re Johnathan T.*, 2022 IL 127222, ¶ 23. Normally, if the trial court considered the merits of defendant's ineffective assistance of counsel claims, we reverse only if there was manifest error. *People v. Jackson*, 2020 IL 124112, ¶ 98. However, when the question is one of procedure, our review is *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28. Here, although the court considered defendant's ineffectiveness claims on the merits, defendant only complains of the court's failure to properly conduct a preliminary *Krankel* inquiry. Thus, our review is *de novo*.

¶ 64    Pursuant to *Krankel*, once a defendant raises a *pro se* posttrial ineffective assistance of counsel claim, the trial court must determine whether defendant's *pro se* allegations show possible neglect of his case. *Jackson*, 2020 IL 124112, ¶ 97. If the court finds the claims pertain to matters of trial strategy or lack merit, it need not appoint *Krankel* counsel. *Id.* However, if the allegations show possible neglect, new counsel should be appointed to independently evaluate defendant's *pro se* claims and represent defendant at the hearing on the *pro se* claims of ineffective assistance of counsel. *Id.* " 'This procedure allows the trial court to decide whether independent counsel is necessary to argue a defendant's *pro se* posttrial ineffective assistance claims at a full *Krankel*

[evidentiary] hearing.' " *People v. Teen*, 2023 IL App (5th) 190456, ¶ 43 (quoting *In re Johnathan T.*, 2022 IL 127222, ¶ 23).

¶ 65    Here, there is no indication that the court inquired into defendant's claims whatsoever before appointing counsel. Rather, about a month after defendant's *pro se* motion raised ineffective assistance of counsel claims, the court—through a brief written order—allowed Bateman to withdraw and appointed Griffin based on defendant's ineffective claims regarding Bateman. Moreover, the court here did not specify whether Griffin was to provide limited representation as *Krankel* counsel or was to represent defendant going forward. As stated in *People v. Reed*, 2018 IL App (1st) 160609, ¶ 51, "Allowing trial counsel to withdraw and appointing new posttrial defense counsel does not satisfy *Krankel* procedure." See also *People v. Roberson*, 2021 IL App (3d) 190212, ¶ 20 ("the purpose of the *Krankel* procedure is not to provide a defendant with effective counsel going forward but to ensure that he received effective assistance previously").

¶ 66    However, unlike *Reed*, the record here shows that Griffin proceeded as *Krankel* counsel and, ultimately, an inquiry into defendant's claims occurred. See *Reed*, 2018 IL App (1st) 160609, ¶ 52. At the March 21, 2022, hearing, Griffin's questioning was directly related to each of defendant's ineffectiveness claims. Griffin's written argument also related to defendant's ineffectiveness claims. The purpose of *Krankel* was therefore fulfilled where Griffin presented each of defendant's *pro se* ineffectiveness claims.

¶ 67    Accordingly, because the purpose of *Krankel* is met where the court fully considered each of defendant's *pro se* claims of ineffectiveness, we find any error in failing to conduct a preliminary inquiry harmless with respect to defendant's *Krankel* claims. See *Jackson*, 2020 IL 124112, ¶ 127 (an error is harmless where, beyond a reasonable doubt, the result would have been the same absent the error). The same, however, cannot be said for defendant's motion to withdraw.

22

¶ 68      In order to appeal a guilty plea, a defendant must comply with Illinois Supreme Court Rule 604(d) (eff. July 1, 2017) and file a motion to withdraw the plea "within 30 days of the date on which sentence is imposed." *Id.* The rule requires "[t]he motion to be heard promptly." *Id.*

¶ 69      Moreover, Rule 604(d) requires counsel to consult with the defendant to ascertain the defendant's contentions of error in the entry of the plea and sentence, examine the trial court file and the report of proceedings of the plea of guilty and sentencing hearing, and make any amendments to the motion necessary for adequate presentation of any defects in the guilty plea or sentencing proceedings. *Id.* Counsel must file a certificate stating that he or she has completed the Rule 604(d) duties. *Id.*

¶ 70      Rule 604(d) "was designed to eliminate needless trips to the appellate court and to give the trial court an opportunity to consider the alleged errors and to make a record for the appellate court to consider on review in cases where defendant's claim is disallowed." *People v. Wilk*, 124 Ill. 2d 93, 106 (1988). "That purpose is to ensure that before a criminal appeal can be taken from a guilty plea, the trial judge who accepted the plea and imposed sentence be given the opportunity to hear the allegations of improprieties that took place outside the official proceedings and *dehors* the record, but nevertheless were unwittingly given sanction in the courtroom." *Id.* at 104. Counsel's certification requirements under the rule furthers this purpose by allowing the trial court to ensure counsel reviewed all of defendant's claims and the relevant bases for a postplea motion. *People v. Gorss*, 2022 IL 126464, ¶ 15. " 'The attorney certificate thereby encourages the preservation of a clear record, both in the trial court and on appeal, of the reasons why a defendant is moving to withdraw his plea or to reduce sentence.' " *Id.* (quoting *In re H.L.*, 2015 IL 118529, ¶ 10).

¶ 71      Counsel must strictly comply with Rule 604(d)'s certification requirement. *In re H.L.*, 2015 IL 118529, ¶ 8. "[E]ven when the certificate is valid on its face, a remand will be necessary if the

record refutes the certificate." *People v. Winston*, 2020 IL App (2d) 180289, ¶ 14. Whether counsel strictly complied with Rule 604(d) is reviewed *de novo*. *People v. Lindsay*, 239 Ill. 2d 522, 525 (2011).

¶ 72    While counsel here filed a facially valid Rule 604(d) certificate, we find the record rebuts the presumption that counsel undertook Rule 604(d) duties, and the court held a hearing on all of defendant's claims in his motion to withdraw his plea. Postplea counsel did not amend any petition, nor clarify which petition he would proceed on. Despite all parties—including the court—stating the March 21, 2022, hearing was to address the motion to withdraw, only defendant's ineffectiveness claims were presented. Importantly, Bateman's motion, as well as defendant's *pro se* motion, asserted issues other than ineffectiveness claims. Namely, the additional issues of improper admonishments and failure to understand the consequences of the plea[1] were presented in Bateman's motion. Certainly, there was overlap regarding defendant's ineffective assistance of counsel claims and other claims in his *pro se* motion (*i.e.*, counsel failed to obtain a mental evaluation and defendant was mentally incompetent to plead guilty). Yet, defendant's *pro se* motion also included additional issues of whether the court coerced defendant to plead guilty by telling defendant he would get the maximum sentence if he went to trial or by denying defendant to proceed *pro se* for a second time.[2] No argument was provided on these additional issues, and the court did not consider them. We further note that Griffin directly contradicted the allegation in defendant's *pro se* motion that he was mentally incompetent to enter a guilty plea where Griffin's

---

[1]The failure to understand the consequences of the plea claim may relate to defendant's contention that he was mentally incompetent; however, we cannot make such conclusion where neither the motion nor Griffin provided further explanation regarding this basis.

[2]We note that defendant's *pro se* motion also asserted—separately from his ineffective assistance of counsel claims—that his plea should be withdrawn because he was mentally incompetent and there was insufficient factual basis for the plea. Defendant's testimony at the hearing related to these issues, but Griffin never argued such issue as an independent basis to withdraw the plea.

24

written argument after the hearing conceded that defendant's mental health issues did not necessarily afford defendant a defense or raise an issue regarding his fitness to stand trial. As such, where the record shows that Griffin failed to clarify which motion to withdraw he intended to present, failed to argue issues raised in either Bateman or defendant's motion, or file an amended motion to withdraw the guilty plea, we find the record rebuts his compliance with Rule 604(d). See *People v. Bridges*, 2017 IL App (2d) 150718, ¶ 11 (record rebuts Rule 604(d) compliance where counsel failed to offer any argument or evidence in support of the motion).

¶ 73   The failure to properly consider all of defendant's contentions of error, beyond his ineffectiveness claims, undoubtedly stems from the confusion created by the court's failure to adhere to proper *Krankel* procedure and delineate Griffin's duties. The proper procedure would have been to inquire into defendant's *pro se* ineffectiveness claims and appoint *Krankel* counsel if the claims showed possible neglect. *Jackson*, 2020 IL 124112, ¶ 97. *Krankel* counsel would have then represented defendant at an evidentiary hearing on defendant's ineffectiveness claims. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 43. If defendant's claims succeeded at the evidentiary hearing, defendant would have been entitled to return to the status quo prior to his guilty plea with new counsel. *People v. Kyles*, 2024 IL App (4th) 230128-U, ¶ 27; see *Krankel*, 102 Ill. 2d at 189 (In the context of a *Krankel* evidentiary hearing regarding a conviction after trial, if "the judge finds that the defendant did not in fact receive effective assistance of counsel based upon counsel's alleged failure to present a valid alibi defense, then he shall order a new trial."). If defendant's claims were denied after an evidentiary hearing, then Bateman should have remained as defendant's counsel and argued the motion to withdraw that he filed, or the court could have appointed Griffin (or other new counsel) to represent defendant generally in the case and argue any remaining issues. See *People v. Buchanan*, 2013 IL App (2d) 120447, ¶ 24. The court,

25

however, did not follow this procedure. As such, errors occurred where no hearing was held on all the claims in the motion to withdraw defendant's guilty plea as required by Rule 604(d). See *People v. Maxwell*, 2013 IL App (4th) 111042, ¶ 13 (under Rule 604(d), defendant is entitled to a hearing on a motion to withdraw a guilty plea).

¶ 74    We find support for our determination in *People v. Kyles*, 2020 IL App (2d) 180087, and *People v. Buchanan*, 2013 IL App (2d) 120447. In *Kyles*, the appellate court remanded for further *Krankel* proceedings where the court's appointment of counsel to "the dual role of *Krankel* counsel and of trial counsel for the remaining matters" created confusion as to whether new counsel completed *Krankel* duties. 2020 IL App (2d) 180087, ¶¶ 46-47.

¶ 75    In *Buchanan*, plea counsel filed a motion to withdraw the defendant's guilty plea because defendant did not knowingly and voluntarily waive his right to a jury trial, did not fully comprehend the court's admonishments, and was coerced into pleading guilty. 2013 IL App (2d) 120447, ¶ 6. At the next hearing, the court was informed that defendant alleged that plea counsel was ineffective, and defendant wanted *Krankel* counsel. *Id.* ¶ 8. The court explained that it would conduct a *Krankel* inquiry before it appointed new counsel. *Id.* Thereafter, upon defendant's request, the court allowed the defendant to proceed *pro se*. *Id.* The court then allowed the defendant to file an amended motion to raise additional ineffectiveness allegations and set the hearing for a future date. *Id.* At the hearing, the defendant appeared *pro se*. Defense counsel and the State were also present. *Id.* ¶ 10. Ultimately, the court denied the defendant's *Krankel* claims and declined to appoint *Krankel* counsel. *Id.* The defendant then argued that his plea agreement included that the State would not try to revoke his probation in Ogle County, but his probation was revoked. *Id.* ¶ 14. The State explained that it agreed to not communicate the defendant's plea with Ogle County but neither the State nor defense counsel had control over whether Ogle County revoked the

26

defendant's probation. *Id.* The court denied the defendant's motion and appointed new counsel to represent defendant on a pending petition to revoke his probation in this case. *Id.* ¶ 15.

¶ 76 The appellate court found that while the trial court was aware of its *Krankel* requirements and conducted the requisite hearing, it was "not clear where the *Krankel* hearing ended and the rest of the hearing began" and the court also effectively denied the motion to withdraw without allowing counsel to argue the merits of that motion. *Id.* ¶¶ 24-25. It determined the trial court did not treat defendant's request to proceed *pro se* as a complete waiver of counsel and allowed defendant to proceed *pro se* only with respect to his ineffectiveness claims. *Id.* ¶ 23. "Upon concluding that defendant's *pro se* claims of ineffectiveness were without merit, the court should have clearly informed defendant that he was not entitled to conflict counsel and, at that point, allowed counsel to argue any remaining issues (or taken a proper waiver of counsel)." *Id.* ¶ 24. As such, the appellate court remanded so that counsel could argue the merits of the motion. *Id.* ¶ 25.

¶ 77 We acknowledge the differences between this case and *Buchanan* and *Kyles*, but find the cases still support our decision. While, unlike *Kyles*, it is clear that Griffin acted as *Krankel* counsel, *Kyles* supports the notion that remand is required when it is not clear that counsel—who the court appointed for dual roles—undertook the duties of both *Krankel* counsel and postplea counsel. Also, in *Buchanan*, no *Krankel* counsel was appointed after the court held a proper *Krankel* inquiry, which differs from the instant case. However, *Buchanan* is similar to here in that both trial courts held a muddled, consolidated *Krankel* and postplea motion hearing that resulted in the court denying a defendant's motion to withdraw his guilty plea without counsel arguing the merits of all of defendant's contentions. Thus, because the record fails to show Griffin knew he needed to present defendant's contentions of error beyond the ineffectiveness claims and the court failed to consider those alleged errors on the merits, we remand for further proceedings.

¶ 78 On remand, defendant should have an opportunity to file a new motion to withdraw his plea with the assistance of counsel. However, because the court has already ruled on his *Krankel* claims, he is not entitled to relitigate those claims. While the court found that plea counsel Bateman was not ineffective, it has already allowed Bateman to withdraw and appointed Griffin to represent defendant. Accordingly, Griffin should complete the duties set forth in Rule 604(d), file a new Rule 604(d) certificate, and amend the motion to withdraw if necessary.

¶ 79 Defendant also argues on appeal that his plea was involuntary because the court refused to allow him to proceed *pro se* and the court told defendant he would get the maximum sentence if he did not plead guilty. "The trial court is the place for fact finding to occur and for a record to be made concerning the factual basis upon which a defendant relies for the grounds to withdraw a guilty plea." *Wilk*, 124 Ill. 2d at 104. As such, we decline to address such issues and find Griffin may assert them in the motion to withdraw on remand if he deems them meritorious.

¶ 80                                   III. CONCLUSION

¶ 81 Counsel failed to comply with Rule 604(d) and the court did not consider all of the contentions in the motion to withdraw defendant's guilty plea. We therefore remand for further proceedings in accordance with our disposition.

¶ 82 Remanded with directions.

¶ 83 JUSTICE CATES, concurring in part and dissenting in part:

¶ 84 After reviewing the record, I agree that postplea counsel Griffin did not comply with the requirements under Rule 604(d) and that the trial court did not consider all of the contentions raised in the defendant's *pro se* motion to withdraw his guilty plea. Therefore, I concur with the majority's decision to remand this case to the trial court to permit the defendant to pursue his motion to withdraw his guilty plea with the assistance of postplea counsel. On remand, counsel

should perform his duties in compliance with Rule 604(d), file a new 604(d) certificate, and amend the defendant's *pro se* motion to withdraw guilty plea, if necessary.

¶ 85    That said, I do not agree with the majority's decision to consider the defendant's claim of error as to the *Krankel* proceedings and so I do not join in their analysis of that matter. Given our findings: (1) that there was overlap regarding the defendant's claims of ineffective assistance of counsel and his claims in his motion to withdraw his guilty plea (particularly his contentions around his mental health issues and mental incompetence); (2) that the trial court held a muddled, consolidated hearing on two separate proceedings—a *Krankel* hearing and a hearing on the motion to withdraw guilty plea; and (3) that the trial court denied the defendant's motion to withdraw his guilty plea without hearing postplea counsel's arguments on the merits of all of the defendant's claims, I would withhold consideration of the *Krankel* argument until the Rule 604(d) proceedings are concluded and a final order is issued on the motion to withdraw the defendant's guilty plea. Accordingly, I concur in part and dissent in part.